IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JONATHAN HILLBERY,<br><br>               Plaintiff,<br><br>v.<br><br>NU SKIN ENTERPRISES UNITED STATES, INC. and NU SKIN INTERNATIONAL, INC.,<br><br>               Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:21-cv-00464-TC-JCB<br><br>District Judge Tena Campbell<br>Magistrate Judge Jared C. Bennett |

Before the court is a motion to compel arbitration and stay action (ECF No. 18) filed by Defendants Nu Skin Enterprises United States, Inc. and Nu Skin International, Inc. (collectively, "Nu Skin"). Nu Skin is a multilevel marketing company that primarily deals in personal care and nutrition products, and Plaintiff Jonathan Hillbery is one of Nu Skin's high-level distributors. Mr. Hillbery alleges that Nu Skin wrongfully accused him of sexual misconduct, which harmed his business and reputation. Nu Skin has moved to compel Mr. Hillbery to arbitrate his case, based on an arbitration clause in a contract that Mr. Hillbery says is invalid. For the following reasons, the court GRANTS Nu Skin's motion and STAYS this case pending arbitration.

## BACKGROUND

Mr. Hillbery began selling Nu Skin products in 2005 through an individual Nu Skin distributorship. In November 2007, Mr. Hillbery merged his distributorship with John Whittaker's distributorship, memorialized by a partnership agreement with Nu Skin Enterprises United States Inc. (Muir Decl. Ex. A, ECF No. 23-1.) Mr. Whittaker and his wife Kathie Whittaker then formed Pharmanex MD, LLC. In December 2007, Mr. Hillbery and the

Whittakers signed a business-entity distributorship agreement between Pharmanex MD and Nu Skin USA. (Muir Decl. Ex. C, ECF No. 23-3.)

By signing this distributorship agreement, Mr. Hillbery agreed to Nu Skin's Policies and Procedures, which had been in place since 2001. (Id.) These "2001 Policies and Procedures" allow a distributor to "terminate his Contract at any time, and for any reason, by sending a written notice of intent to terminate to the Company," effective "as of the date the Company receives written notice of termination." (Muir Decl. Ex. D § 6.C., ECF No. 23-4.) The 2001 Policies and Procedures also contain an arbitration clause:

> The Company and the Distributor agree that mandatory and binding arbitration is the sole means to resolve disputes which arbitration shall be final and non-appealable. In order to expedite the prompt resolution of any disputes with the Company or between Distributors, which may arise under the Contract, the Company has instituted a Mediation/Arbitration policy. This policy deals with the disposition of disputes arising out of the independent contractor relationship between the Company and its independent contractors and/or disputes arising out of the relationship between the Company's independent contractors themselves. Distributor complaints are first handled by the Distributor Conduct Review Committee as described by Section 6 of these Policies and Procedures. The Mediation/Arbitration policy will also apply in the event a Distributor disagrees with any disciplinary action or interpretation of the Contract by the Company. The Mediation/Arbitration policy is mandatory and binding for resolving Distributor disputes as of April 1, 1994. The complete Mediation/Arbitration policy is available upon request from the Legal Department to parties who are involved in a controversy as defined above.

(Id. § 30.B.) "Company" is defined as "Nu Skin U.S.A., Nu Skin Personal Care, Pharmanex, and Big Planet." (Id. § 1.) Subsection 30.B. incorporates by reference a "Mediation/Arbitration policy."[1] (Id. § 30.B.)

According to the Defendants, Nu Skin U.S.A. is just another name for Nu Skin United States, Inc. (Suppl. Muir Decl. ¶ 8, ECF No. 29.) Nu Skin United States, Inc. changed its name

---

[1] Nu Skin contends that this policy is the "Nu Skin International, Inc. Appeal and Mediation/Arbitration Policy." (Muir Decl. Ex. E, ECF No. 23-5.) Mr. Hillbery disagrees. This is not a question that the court must answer here.

to Nu Skin Enterprises United States, Inc. in November 2004.  (Id. ¶¶ 6–7.)  And Nu Skin International, Inc. is a wholly owned subsidiary of Nu Skin Enterprises United States, Inc.  (Id. ¶ 5.)  (These are the two Defendants in this case.)

In the 2001 Policies and Procedures, Nu Skin reserved the right to modify the contract terms "upon thirty days prior written notice" by publication or mailing.  (Muir Decl. Ex. D § 23, ECF No. 23-4.)  A modification becomes effective thirty days after notice.  (Id.)  And by "continuing to act as a Distributor, or engaging in any Distributorship activity," a Nu Skin distributor "acknowledges acceptance of the new Contract terms."  (Id.)

And Nu Skin did just that in October 2010.  The "2010 Policies and Procedures" contain expansive arbitration provisions.  (Muir Decl. Ex. F ch. 7, ECF No. 23-6.)  All "disputes" are subject to mandatory and binding arbitration.  (Id. ch. 7, § 2.)  "Disputes" are

> ANY AND ALL PAST, PRESENT OR FUTURE CLAIMS, DISPUTES, CAUSES OF ACTION OR COMPLAINTS, WHETHER BASED IN CONTRACT, TORT, STATUTE, LAW, PRODUCT LIABILITY, EQUITY, OR ANY OTHER CAUSE OF ACTION, (I) ARISING UNDER OR RELATED TO THIS CONTRACT. (II) BETWEEN YOU AND OTHER DISTRIBUTORS ARISING OUT OF OR RELATED TO A DISTRIBUTORSHIP, OR YOUR BUSINESS RELATIONSHIPS AS INDEPENDENT CONTRACTORS OF THE COMPANY, (III) BETWEEN YOU AND THE COMPANY, (IV) RELATED TO THE COMPANY OR ITS PAST OR PRESENT AFFILIATED ENTITIES, THEIR OWNERS, DIRECTORS, OFFICERS, EMPLOYEES, INVESTORS, OR VENDORS, (V) RELATED TO THE PRODUCTS, (VI) REGARDING THE COMPANY'S RESOLUTION OF ANY OTHER MATTER THAT IMPACTS YOUR DISTRIBUTORSHIP, OR THAT ARISES OUT OF OR IS RELATED TO THE COMPANY'S BUSINESS, INCLUDING YOUR DISAGREEMENT WITH THE COMPANY'S DISCIPLINARY ACTIONS OR INTERPRETATION OF THE CONTRACT.

(Id. ch. 7, § 3.)  The 2010 Policies and Procedures define "Company" as "Nu Skin Enterprises United States, Inc. and its affiliated entities."  (Id. Addendum A.)  They also allow Nu Skin to modify the contract terms in the same manner provided for in the 2001 Policies and Procedures.

3

(Id. ch. 8, § 1.1.) A distributor "may terminate [his] Distributorship at any time by providing a signed written notice to the Company."[2] (Id. ch. 1, § 4.4.)

Nu Skin amended its Policies and Procedures a third time in 2018. (Muir Decl. Ex. G, ECF No. 23-7.) The "2018 Policies and Procedures," which are currently in effect, are similar to the 2010 Policies and Procedures. Both versions use the same definition of "dispute" in a similar arbitration clause, define "Company" indistinguishably, and provide for an identical contract modification procedure. (See id. ch. 7; Addendum A; ch. 8, § 1.1.) The main difference between the 2010 and 2018 Policies and Procedures is that Distributors are now called "Brand Affiliates," and "Distributorships" are called "Brand Affiliate Accounts." (Id. Addendum A; Muir Decl. ¶ 26, ECF No. 23.)

Mr. Hillbery alleges that in August 2014 he terminated his distributorship by sending written notice to Nu Skin employees Darryl Mauck and Amy Baker. (Hillbery Decl. Ex 1-3, ECF No. 24-4; Suppl. Hillbery Decl. ¶¶ 3 & 5, ECF No. 40-1.) Nu Skin claims that when Mr. Hillbery sent this notice, he did so with the express instruction that the company not act on it. Nu Skin also claims that Mr. Hillbery later asked the company to destroy the letter. (Reply at 5, ECF No. 28; Mauck Decl. ¶¶ 7–11, ECF No. 30.) Mr. Hillbery denies ever giving these instructions; he states that he always intended his August 2014 letter to be an unequivocal termination. (Surreply at 4–5, ECF No. 40; Suppl. Hillbery Decl. ¶¶ 5–12, ECF No. 40-1.) Since this alleged termination, Mr. Hillbery maintains that he has been a contract employee of Pharmanex MD, not a Nu Skin distributor or brand affiliate. (Hillbery Decl. ¶¶ 13–14, ECF No. 24-1.)

---

[2] Nu Skin argues in its reply memorandum that to terminate an interest in a business entity distributorship, a distributor must first obtain Nu Skin approval. (Muir Decl. Ex. F ch. 1, § 3.1, ECF No. 23-6.) In other words, signed written notice is insufficient; the participants must all submit an "amended Business Entity Form." (Id.) This is not an issue that the court must resolve here.

In late 2019 or early 2020, Nu Skin began investigating allegations that Mr. Hillbery had engaged in sexual misconduct with several current and former Nu Skin distributors. During the investigation, Nu Skin employees purportedly discussed the misconduct allegations with witnesses, distributors, and other employees. In August 2020, Nu Skin told Mr. Hillbery that he could not conduct any business related to Nu Skin, and it told him not to discuss the allegations with any Nu Skin personnel. Mr. Hillbery alleges that the restrictions have still not been lifted, which has caused him reputational and economic harm.

In July 2021, Mr. Hillbery filed the present suit, alleging two causes of action: defamation and intentional interference with economic relations. (Compl., ECF No. 2.) He amended his complaint in September 2021. (Am. Compl., ECF No. 16.) Nu Skin has moved the court to compel arbitration and stay the case pending arbitration. (ECF No. 18.) The motion has been fully briefed, including a surreply, and the court held oral argument on January 19, 2022. Mr. Hillbery has also filed a motion to strike Brian Muir's second supplemental declaration, along with evidentiary objections.[3] (ECF No. 41.)

## LEGAL STANDARD

Determining whether a dispute is subject to arbitration "is similar to summary judgment practice." Bellman v. i3Carbon, LLC, 563 F. App'x 608, 612 (10th Cir. 2014) (quoting Hancock v. Am. Tel. & Tel. Co., 701 F.3d 1248, 1261 (10th Cir. 2012)). The party moving to compel arbitration must present "evidence sufficient to demonstrate the existence of an enforceable agreement." Id. The burden then shifts to the nonmoving party "to raise a genuine dispute of material fact regarding the existence of an agreement." Id.

---

[3] The court does not base its decision on any of the statements made in Mr. Muir's second supplemental declaration (ECF No. 38), so it will overrule Mr. Hillbery's evidentiary objections and deny his motion as moot.

## ANALYSIS

The Federal Arbitration Act ("FAA") applies to arbitration provisions in "a contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Under the FAA, these provisions "are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Id. Section 2 of the FAA creates "a substantive rule applicable in state as well as federal courts." Southland Corp. v. Keating, 465 U.S. 1, 16 (1984). To implement this rule, "a party may apply to a federal court for a stay of the trial in an action upon any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. The FAA is "a liberal federal policy favoring arbitration," and "arbitration is a matter of contract." AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011). As a result, "courts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." Id. Neither side disputes that the FAA governs here.

The FAA, however, "was not enacted to force parties to arbitrate in the absence of an agreement." Avedon Eng'g, Inc. v. Seatex, 126 F.3d 1279, 1286 (10th Cir. 1997). Rather, Congress intended that courts "enforce private agreements into which parties had entered." Id. So "[t]he existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." Id. at 1287. "To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation . . . of the specific arbitration clause that a party seeks to have the court enforce." Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 297 (2010). "Such issues always include whether the clause was agreed to, and may include when that agreement was formed." Id. "When parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement." Hardin v. First Cash Fin.

6

Servs., Inc., 465 F.3d 470, 475 (10th Cir. 2006) (quoting Avedon, 126 F.3d at 1283); see also 9 U.S.C. § 4 ("If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.").

But challenges to "the validity of the agreement to arbitrate" are different from challenges to "the contract as a whole." Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 70 (2010). Courts have drawn a clear line between these two types of challenges. See, e.g., Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445–46 (2006). If the plaintiff's challenge to an arbitration clause implicates the entire contract, the arbitrability question must go to the arbitrator. See, e.g., In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litig., 835 F.3d 1195, 1211 (10th Cir. 2016). The Supreme Court has not decided whether courts must decide whether the parties ever signed a contract in the first place, but it has implied that courts may decide this issue. See Buckeye, 546 U.S. at 445 n.1; Rent-A-Ctr., 561 U.S. at 70 n.2.

### I.     Nu Skin's Prima Facie Case

The court finds that Nu Skin has made its prima facie case that an enforceable agreement exists and that Mr. Hillbery's causes of action fall within its scope. Nu Skin amended its 2001 Policies and Procedures by following its rules—i.e., by giving notice to all its distributors and by Mr. Hillbery's continuing to transact Nu Skin business. Even assuming Mr. Hillbery terminated his relationship with Nu Skin in 2014, he was still bound by the 2010 Policies and Procedures, which subject "all . . . future claims, disputes, causes of action or complaints . . . based in . . . tort" between a distributor and Nu Skin to mandatory arbitration. (Muir Decl. Ex. F ch. 7, § 3, ECF No. 23-6.) Even though the sexual misconduct investigation occurred after Mr. Hillbery's alleged departure from the company, the arbitration clause covers "future" claims, so long as they are "regarding the Company's resolution of any other matter that impacts your

Distributorship" or "aris[ing] out of or . . . related to the Company's business, including [a distributor's] disagreement with the Company's disciplinary actions or interpretation of the Contract."  (Id.)  Mr. Hillbery's claims fit the bill.

## II. Mr. Hillbery's Objections

But Mr. Hillbery gives four reasons why the court should still deny Nu Skin's motion to compel arbitration.  These reasons follow a logical chain.  First, Mr. Hillbery argues that he never agreed to arbitrate claims against the two Defendants.  His initial distributorship agreement was with Nu Skin USA, not the Defendants, and his partnership agreement with Nu Skin Enterprises United States, Inc. (a Defendant here) did not have an arbitration clause.  Second, he argues that the 2010 Policies and Procedures never applied to him because he did not receive adequate notice, nor did he consent to the changes.  Third, Mr. Hillbery argues that the 2018 Policies and Procedures are invalid for the same reasons.  Finally, he argues that his causes of action arose out of events that took place long after he terminated any relationship with Nu Skin, so even if he would have been previously bound by an arbitration clause, that clause does not apply here.  He essentially challenges both the existence of a valid arbitration agreement and that his tort suit would fall within its scope.

Mr. Hillbery raises compelling arguments, and he presents facts that may well prove to be true.  But at this stage, these facts and arguments are red herrings.  The key question here is whether Mr. Hillbery is challenging a Nu Skin arbitration clause or an entire Nu Skin contract.  Instead of confronting this issue, Mr. Hillbery jumps ahead to discuss issues that are premature.

Mr. Hillbery admits that he is bound by the 2001 Policies and Procedures,[4] including its arbitration clause, but claims that it only covers disputes with nonparty Nu Skin U.S.A. His main argument against enforcing the 2010 or 2018 Policies and Procedures is that Nu Skin cannot "create new rules against a former contracting party and then enforce those against him." (Opp'n at 9, ECF No. 24.) Because Nu Skin purported to have the unilateral power to "contractually bind distributors" by modifying the contract "with little or no actual notice," any changes made to the 2001 Policies and Procedures are legally invalid. (Id.)

Although Mr. Hillbery does not call the Policies and Procedures "illusory," this is essentially what he is arguing. By giving itself the unfettered right to change the Policies and Procedures at any time, Nu Skin was not truly bound to any of its obligations. This is the same argument that the plaintiffs made in In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litigation, 835 F.3d 1195 (10th Cir. 2016). Cable and internet provider Cox Communications had an internet-subscriber agreement that contained the following provision: "Cox reserves the right to modify the terms of this Agreement and prices for the Service . . . [and] Cox may discontinue or revise any or all other aspects of the Service . . . in its sole discretion at any time by posting changes online." Id. at 1199. The internet-subscriber agreement also required that all claims and disputes be arbitrated. Id. The plaintiffs argued that because Cox retained unilateral control to change its contract without new consideration, it could change the arbitration clause at any time, which made the clause illusory. Id. at 1209.

---

[4] Because it is undisputed that the 2001 Policies and Procedures apply, the court is not tasked here with deciding "whether [Mr. Hillbery] ever signed the contract." Buckeye, 546 U.S. at 445 n.1; cf. Spahr v. Secco, 330 F.3d 1266, 1273 (10th Cir. 2003). The 2001 Policies and Procedures are valid; Nu Skin's modification policy is at issue.

"Plaintiffs may be correct," the Tenth Circuit stated, "[b]ut that is an issue for the arbitrator, not the district court or this court." Id.  The court divided its analysis into three parts.  First, it emphasized the Supreme Court's instruction that "[o]nly if an enforceability argument applies only specifically to the arbitration provision . . . is enforceability to be decided by the court." Id.  Second, it held that the plaintiffs' illusoriness argument was an attack on the entire contract, not just the arbitration clause.  Third, it found nothing in state contract law that would require independent consideration for each contractual provision.  The Tenth Circuit thus affirmed the district court's order compelling arbitration.

Applying In re Cox here, Mr. Hillbery's arguments must go before an arbitrator.  "[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." Buckeye, 546 U.S. at 445–46.  Mr. Hillbery's argument against the Nu Skin contract modification policy is really an attack on the entire contract.  If Nu Skin was unable to change its 2001 Policies and Procedures in its prescribed way, the entire 2010 Policies and Procedures—not just the arbitration clause—would be invalid.  Illusoriness simply goes to consideration, and when "the agreement to arbitrate is integrated into a larger unitary contract, the consideration for the contract as a whole covers the arbitration clause as well." In re Cox, 835 F.3d at 1211 (quoting Dr.'s Assocs., Inc. v. Distajo, 66 F.3d 438, 453 (2d Cir. 1995)).  Indeed, Nu Skin's modification policy is found in an entirely different section of the 2001 Policies and Procedures.  (Muir Decl. Ex. D §§ 23, 30.B., ECF No. 23-4.)  And nothing in Utah law compels a different conclusion.  Of course, in Utah, contracts must have an "offer, acceptance, and consideration." (Opp'n at 9, ECF No. 24 (citing Cea v. Hoffman, 2012 UT App 101, ¶ 24, 276 P.3d 1178, 1185).)  But Mr. Hillbery has not shown that in Utah, "each provision of a contract must be supported by consideration expressed in that

10

provision." In re Cox, 835 F.3d at 1212 (emphasis added).  Because his challenge to the Nu Skin modification policy applies broadly to the entire 2010 Policies and Procedures, it must be decided by an arbitrator, not the court.

## CONCLUSION

Nu Skin has met its prima facie burden of showing that Mr. Hillbery agreed to arbitrate all Nu-Skin-related disputes arising in tort based on the 2010 Policies and Procedures.  Although Mr. Hillbery raises many factual disputes, none are material here.  To the extent that Mr. Hillbery wishes to challenge Nu Skin's unilateral changes to the Policies and Procedures, an arbitrator must decide those issues.

## ORDER

Nu Skin's motion to compel arbitration and stay action (ECF No. 18) is GRANTED.  An arbitrator must decide whether Mr. Hillbery is bound by a Nu Skin arbitration policy, and if so, whether his claims fall within that policy's scope.  If the arbitrator decides that Mr. Hillbery's tort claims are subject to an arbitration policy, the parties must arbitrate those claims.  But if the arbitrator decides that Mr. Hillbery's claims are not subject to an arbitration policy, the parties shall return here to continue the litigation.

Until then, the court STAYS all claims in this action.  Mr. Hillbery's motion to strike (ECF No. 41) is DENIED as moot.

DATED this 25th day of January, 2022.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge